MONCURE, P.,
delivered the opinion of the court.
This is a writ of error to a judgment of the hustings court of the city of Richmond, rendered in March, 1879, in favor of the commonwealth against the plaintiff in error William P. Nuckolls, convicting him of a misdemeanor.
*Such conviction was upon an indictment containing two counts. In the first it was charged, that within twelve months next preceding the indictment, at the said city, and within the jurisdiction of the said hustings court, he unlawfully did keep and exhibit gaming tables commonly called A B C and E O tables, faro bank, wheel of fortune, keno table, and tables of the like kind, being under denominations to the grand jurors unknown; the games then and there played on the tables aforesaid being games played with cards. In the second count it was charged, that within the period, and at the place aforesaid, he unlawfully was a partner and concerned in interest in the keeping and exhibiting of gaming tables as aforesaid.
The said indictment was founded on the Code, page 1212, ch. 194, § 1, which is in these words: “A person who shall keep or exhibit a gaming table, commonly called A B C or E O table, or faro bank, or keno table, or table of the like kind, under any denomination, whether the game or table be played with cards, dice or- otherwise, or who shall be a partner or concerned in interest in the keeping or exhibiting such tables or bank, shall be confined in jail not less than two nor more than twelve months, and be fined not less than one hundred, nor more than one thousand dollars. Any such table or faro bank, and all the money, stakes or exhibits to allure persons to bet at such table, may be seized by order of a court, or under the warrant of a justice; and the money so seized, after deducting therefrom one-half for the person making the seizure, shall be forfeited,” &c., “and the table and faro bank shall be burnt.”
The plaintiff in error was convicted on the said indictment on the 17th day of December, 1878, but the judgment was after-wards reversed, and a new trial was awarded by this court; on which new trial he was again convicted by the said hustings court, which overruled his motion for a new trial, and rendered judgment against him according *to the verdict in March, 1879, to which this court awarded a writ of error as aforesaid; and that is the case which this court has now to dispose of. The questions arising in the case are presented by five bills of exceptions, which were made parts of the record in the progress of the trial, and will now be considered and disposed of in the order in which they were taken and are numbered.
_ I. It is stated in the first bill of exceptions that during the trial of the case, after the attorney for the commonwealth had made his opening statement, and the attorney for the accused had done the same, the prisoner, by his counsel, moved the court to require the prosecuting attorney to furnish him a statement or bill of particulars showing when, how and where the offence of which he is accused was committed, the same not being sufficiently specified in the indictment; which motion the court overruled on the ground *295 that the indictment had been passed upon by this court, and that this was a motion unheard of in a criminal case, as far as the court is advised; to which ruling of the court the prisoner excepts.
Without assigning any other reason than that assigned by the hustings court, which is deemed sufficient for its action in this respect, this court is of opinion that there is no error in such action.
II. It is stated in the second bill of exceptions that on the trial of the cause the commonwealth introduced as the first witness one J. P. Jeter; whereupon the prisoner, by his counsel, moved the court to permit him to take down the evidence in the cause in writing; but there having been at the time of such motion no exception taken to any portion of the testimony, and the court having stated to the counsel that as soon as any exception was taken which would require the statement of the evidence to be set forth in writing, it would, according to its custom, stop the trial, and in the presence of the witnesses have the bill or bills *of exceptions, with the evidence,, prepared, &c., the court overruled said motion; to which ruling of the court the prisoner excepted.
This ruling of the court was plainly right.
III. It is stated in the third bill of exceptions that on the trial of the cause the commonwealth introduced a witness — M. J. Griffin — and asked him to explain to the jury, if he could, how the game of “keno” was played; thereupon the attorney for the prisoner asked the witness if he was an expert at the game of keno; to which the witness answered no, but that he had played it twice, and seen it played two or three times. The attorney for the commonwealth then asked the witness if he knew how the game was played; to which the witness answered that he did; and then the said attorney asked the witness to explain to the jury what he knew of the game; and thereupon the prisoner objected to the witness stating to the jury what he knew of the game, on the ground that the witness was not an expert; but the court overruled the objection, and allowed the witness to state what he knew of the game; to which ruling of the court the prisoner excepted.
The evidence objected to was certainly admissible. The weight of it was of course a subject for the consideration of the jury. The evidence of an expert, if there can be an expert in such a matter, and the witness was not in fact such an expert, still his evidence, to the extent of his knowledge on the subj ect which he explained, was admissible, and it was uncontradicted by the evidence of any expert introduced as a witness by the prisoner. There was, therefore, no error in the action of the court in overruling the said objection.
IV. In the fourth bill of exceptions precisely the same question is presented in regard to the game of faro as in the third bill of exceptions is presented in regard to the game of keno, and the facts in regard to the two games in this case are the same, or similar. For the reason already ^assigned in regard to the third bill of exceptions. there is, therefore, no error in the action of the court below in regard to the fourth bill of exceptions.
V. In the fifth and last bill of exceptions is presented the only difficulty arising in the case, which, however, is certainly a very serious difficulty, and the question we now have to solve is, whether such difficulty be not in fact insurmountable.
It is stated in that bill of exceptions that on the trial of the cause, after the jury had returned their verdict into court — “we, the jury, find the prisoner guilty” — the prisoner, by his counsel, moved the court to set the said verdict aside, because the same was contrary to law and the evidence, and grant him a new trial; which motion the court overruled; and the prisoner excepted. On his motion, the court certified the facts proven on the trial; which, so far as it seems to be material to state them here, are in substance as follows:
“The commonwealth first introduced one J. P. Jeter, who proved that as sergeant of police, by direction of chief of police of the city of Richmond, on Saturday night, 10th day of November, 1878, at about 10 o’clock at night, he, in company with two other policemen, went to house No. 20, located on Fourteenth street in said city, the lower part being occupied by one John Pitt as a tailor’s shop; that he went up stairs and knocked at the door; he heard some one say, ‘here come our oysters’; that he was dressed in citizens, clothes at the time. The door was opened by the prisoner, who asked him to come in. He went in saying to the other policemen, ‘Come on, boys’; that on entering the room he saw two round tables, a sideboard, a stove and some chairs, and nine or ten men; that the room was nicely carpeted, and divided from the front part of the house by a partition extending from the floor to near the ceiling, with an open door in it; around one of the tables five men were seated playing cards, he thought the game of poker *or draw-bluff; that one of these men made two plays after he entered the room and had taken hold of the bone or ivory chips he found on the table with which they were playing the game, but he could not say that this man knew him; that the prisoner was not playing, or had anything to do with the game that he knew of; that he found in the drawer of a sideboard a quantity of chips like those the men were playing with, on a small tray, and about nine dollars in money; that as he was about to open this drawer to search it,' the prisoner said to him, there is nothing in there; after he found the tray and money he asked for the owner of it, or the proprietor of the house, not certain which, to come up and see it counted, but no one claimed to be either; that ifi the front room he found a bed and two trunks, one of which the prisoner claimed as his own and promptly opened it, that it might be searched; but the other he said belonged to a man who had gone down the street; that he did not know his name; that Black was not present in either room; that he asked prisoner for the key to open the other trunk, saying if not opened he would have to break it open; when prisoner loaned him a bunch of keys, *296 but none of them would fit; that one of the policemen tried his keys, but they would not open the trunk; some one of them called the name of Black, and he said to Wm. P. Nuckolls, the prisoner, if this is Black’s trunk, tell me, I know where to find him, and I will go and get the keys from him; if you do not tell me I shall have to break the trunk open; prisoner then said, ‘yes, it is Black’s trunk’; that he went to hunt for Black, could not find him, and returned to the station house and picked the lock of the trunk; found in the trunk, which was afterwards claimed by Thomas G. Black, a cloth called a faro layout cloth; that this cloth was folded up and creases remained in the cloth where the folds were; that he found Black next morning in the same room and arrested him.
_*“It was also proved by one D. W.. Rider, that he was playing in the game at the time of the arrest; they were playing a friendly game of draw poker; that he liad played this game at the same place one time before the arrest; that he saw both Thomas G. Black and William P. Nuckolls there each time; that neither of them was his associate, though he knew them both, and had known Nuckolls for some time; that he went to this room to play because he was invited to go there, and understood he could play a game there; but before be began to play he obtained a stack of 20 chips from Black, that he purchased a second stack from Black; he paid one dollar for first stack, but returned Black the other without paying anything for it; that no one had any advantage over him as a player in this game; but whenever threes, or a better hand than threes, were held by any player, and his hand was called, one chip was laid aside by the winner for the keeper of the room; that the game was played by the deal passing around to the left from one to the other of the players, the dealer always dealing out to the others one card at a time until each player held five cards; that the player sitting to the left of the dealer then put upon the middle of the table one chip, and the player sitting to his left could then put up one or more chips, or decline to bet if he wished, each player in his turn doing the same thing until all had exercised this privilege; after this, each player beginning at left of dealer, would say how many cards he wished to draw from the pack, discarding that number from one up to five from those held in his hand; when each player had been _ furnished, the betting began again, beginning at the left of the dealer, each player again having the right to bet or retire from that deal by discarding his cards; that when the betting was ended, the winner was he who held the highest hand, though sometimes a winner would succeed in scaring or bluffing off the other players by outbetting them; that the highest hand at this game was, first the *highest card when neither held a pair; next highest hand was the highest pair when neither player held two pair; the next highest hand was two pair over one pair; the next highest hand was the highest-two pair when each held two pair; the next highest hand was threes of one kind; the next highest hand was a flush, and this was when five cards of one suit was held, say five hearts or five diamonds; the next highest hand was a full, that is, three of one number and a pair of another; the next highest hand to this, and the highest in the game, was fours, and this was when fours of one kind was held, say four kings or four aces; and that in this game it was agreed between the players, before they began to play, that when threes or a better hand was called, one chip was to be laid aside for the keeper of the room; that this agreement was generally made by the players before they commenced a game, and was a voluntary contribution to pay for use of gas, fuel, and room; that he did not suppose they coukl play in this room without giving something, as no one could provide a room for nothing; that on the night in question they had been playing from three to four hours, and had laid by, .he supposed, from ten to fifteen chips, and that the chips were valued at five cents each; that neither Black nor the prisoner had been playing in the game, or hgd anything to do with it,' so far as he knew, except that the chips had been purchased from Black, who for convenience was to furnish the chips and keep the money until the close of the game, paying for them the same he received for them, except that he was not required to pay for or redeem those laid aside for the keeper of the room during the game; that sometimes one of the players was selected to do this for convenience; that in this game there were none playing but friends, and no one could come into the game without their consent, and none but a friend or some one personally known to one of the players would have been permitted to come into the game; that *during their play at times both Black and prisoner were out of the room at the same time; that a part of the money found in the drawer was his, and balance belonged to his friends who were playing in the game, except so much as might be due for chips laid aside for th.e keeper of the room;, the money was same paid to Black for the chips they were playing with; that he heard the officer ask for the owner of the money or proprietor of the house to come up and see the money counted, but said nothing; and that if the game was played long enough, the keeper of the room, under this arrangement, was compelled to get nearly all of the money; that he could, by no possibility, lose anything in the game, and must, under the arrangement, get a chip whenever ‘threes or a better hand’ — i. e., ‘threes,’ a ‘flush,’ a ‘full,’ or ‘fours’ — were held by any player and that player was ‘called’; and that it was simply a question of-time for him to get all, or nearly all, of the-money around the table.
“The commonwealth then introduced one M. J. Griffin as a witness, who proved that he had seen the games of ‘keno’ and ‘faro’ played on other occasions and gave an account of those games, but as neither of those games was played by the prisoner or others on the occasion to which this pros *297 ecution applies, and as the game which was played on that occasion was not a game or table of the like kind with faro bank or keno table, or any of the games or tables specified in the section on which this prosecution is founded, it is unnecessary to insert here the facts proved by this witness, which seem to be irrelevant to this case.
“The commonwealth also proved by a witness, one B. W. Hancock, that be was playing in the game at the Júme of the arrest on the night named; that when he went into the room he found four men playing, and he said to Nuckolls, I should like to get into that game, when Nuckolls said to him the game is made up, I believe, I don’t know *whether you can get into it or not, but I will ask them; that Nuckolls then asked the players if they had any objection to his (Hancock’s) coming into the game; and they signified their assent, when he paid Nuckolls a dollar and got from him a stock of chips and commenced playing; that he had seen the game played often, and that it was a rule of the game as played_ at such places, and had always seen something taken out for the use of the keeper of the room whenever threes or a better hand was held and called; that they generally took out twice as much as the chip was worth for the room whenever threes or a better hand was held and called; that on this occasion they were setting aside ten cents whenever threes or a better hand was called and shown; that sometimes, when neither bettor held a pair, the player having the highest card would win, and then nothing was set aside; the next highest hand to the highest card was when a single pair was held, when the man holding the highest pair would win, and then nothing was laid aside for the room; that the next highest hand was when two pair beat one pair, and then nothing was laid aside for the house; that sometimes a player would win without showing the cards he held, by simply betting enough to scare off his opponent, and then nothing was laid aside for the house; that the next highest hand above two pair was when a player held three of one kind, and then if a winning was made by a call and showing the threes, the chip was taken from the winner and laid aside for the room; that the next highest hand above threes was a flush, and if a winning was made by showing the flush the chip was laid aside for the room; that the next highest hand was a full, and the next highest hand above a full was when fours were held, and in each of these cases a chip was laid aside for the room, but that fours were very seldom held. He also proved that part of the money found in the drawer was his.
“The commonwealth also proved by a witness, one *Thomas G. Black, that he was the renter of the room in question, and the owner of all the furniture, and also of the faro lay-out, but that had not been used for two years; that he did not know who was the owner of the chips found there with which the game was played; that he and William P. Nucholls, the prisoner, were jointly interested in the game; that he had been tried and acquitted for the same offence, and that Nuckolls had told him that he (witness) could clear him (the prisoner) by coming into court and swearing that he was not interested in the game; which he refused to do; that Nuckolls got one-half of what was made on the game, and he (witness) got the other half.
“For the defence it was proved by one witness, John Pitt, that he rented out premises in question — rented it to Thomas G. Black; that Black paid both the rent and gas bill, and that he never knew Nucholls in the transaction, or that he had anything to do with it; that he rented the rooms to Black for a sleeping apartment and never knew that any gaming was carried on in there.”
The game proved to have been played in this case was certainly not one of the games specified in the statute, Code, p. 1213, ch. 194, § 1. It was not a keeping or exhibition of “a gaming table, commonly called A B C or E O table, or faro bank, or keno table.” And if the case comes within the terms, intent or meaning of the statute, it can only be because the game proved to have been played in this case was the keeping or exhibition of a table of the like kind with those specified in the said statute.
.Was it a case of the like kind as aforesaid? In what does the likeness consist? The record does not show. Can the accused be said to have been a keeper or exhibitor of a gaming table in the meaning of the statute? He may have owned or had an interest in the tables on which the game was played. He took no part in playing the game, was not always present while it was played, and had no ^interest in it except that he had a chance to receive a portion of the winnings, under an agreement with the parties to the game to compensate him for the use' of the house and the tables which were used in carrying on the game. The amount received under this agreement does not appear, so far as it is disclosed by the record, to have been an extravagant compensation for such use; but whether so or not, does not seem to affect the question we are now considering. The game played in this case was poker, or draw poker.
In regard to what is a table of the like kind with those specified in the statute, according to its true intent and meaning, there are two decisions of this court which seem to settle the matter beyond all controversy. They are, The Commonwealth v. Wyatt, 6 Rand. 694, decided in 1828; and Huff’s case, 14 Gratt. 648, decided in 1858.
In Wyatt’s case, supra, it was unanimously held by the late general court, in an opinion delivered by Daniel, J., that “the distinctive feature in the character of the games called ABC and E O and faro bank, is that the chances of the game are unequal, all other things being equal, and those unequal chances are in favor of the exhibitor of the games or tables. If other games resemble those standard games in that distinctive feature, they come within the terms of the 17th Section of the gaming act, (corresponding with *298 the 1st section of the present gaming act), being ‘gaming tables of the same or like kind’, and are liable to the penalties denounced against those standard games, whatever may be the denomination of those other games, and whether played with cards, dice, or in any other manner.”
In Huff’s case, supra, it was unanimously held by this court, in an opinion delivered by Allen, P., that “an indictment for gaming under the 1st section of chapter 198 of the Code, (corresponding with the 1st section of the gaming act in the present Code), must charge the playing *of one of the games specified; or it must show by averment that the gaming charged is of the like kind as those specified — that is, that the chances of the game are unequal, all other things being equal.”
These two cases clearly show that the game proved to have been played in this case was not a game of the like kind with any of those specified in the statute, as it was clearly not one of the games so specified. The accused was not an exhibitor of a gaming table such as seems plainly to be contemplated by the statute — a gaming table against which the betters at the game risk their money. He had no interest in the game, except as a means of compensation for the house, the tables and the gas, which were used in carrying on the game. It does not appear that such compensation derived in that way exceeded what might reasonably have been charged directly for the same consideration. At all events, it is not perceived how that mode of receiving such compensation can convert what would otherwise be a lawful act into one which would be highly penal. If it be deemed reasonable and proper that the owner of a house, receiving compensation in that way for the use of his house and his tables for gaming purposes, should be punished as an exhibitor of a gaming table under section 1 of chapter 194 of the Code, page 1212. it ought to be plainly so declared by statute, instead of being_ left as a matter of such forced and violent inference.
In the argument of this case before this court the Arkansas Code and reports were referred to, which seem to have an important bearing upon the case. In the said Code of 1858. page 369, chap. 51, art. 111, § 1, it is declared, in language very similar to that of our Code, that every person who shall set up. keep or exhibit any gaming table, &c., commonly called A B C, E O, &c., or any faro bank or other gaming table, &c., of the like or similar kind, &c., shall be deemed guilty of a misdemeanor, and *be fined not less than $100 and imprisoned not less than thirty days nor more than one year. The subsequent sections of the same article embrace the residue of the statute against gaming.
In Stith v. State, 13 Ark. R. 680, it was held by the supreme court of that state that the owner or occupant of a house, &c., cannot be indicted under the fourth section of the gaming act for permitting poker or any of the small games of cards mentioned in the 8th section of the act to be played in his house, &c., but only for suffering some of the games, tables, cardé, &c., embraced in the previous sections to be played, &c., therein. The Chief Justice, in delivering the opinion of the court in that case, uses this strong and appropriate language: "An attentive perusal of the statute makes the conclusion almost irresistible that the first seven sections are intended to relate exclusively to the banking games, whether called by the names specified or by any new name or device. They are usually exhibited by persons whose occupation it is to prey upon the community, and who are therefore peculiarly obnoxious to the laws, which be-sign also to punish with equal severity those who allow them to be exhibited in their houses.” Id. 682.
See also Barkman v. The State, Id. pp. 703 and 705, and The State v. Hawkins, 15 Id. 259.
The court is therefore of opinion that the said^ hustings court erred in overruling the motion of the prisoner to set aside the verdict because the same was contrary to law and the evidence and grant him a new trial, as mentioned in his said fifth bill of exceptions. And for that cause, the said judgment is reversed, the said verdict set aside, and the cause remanded to the said hustings court for a new trial to be had therein, in conformity with the foregoing' opinion.
*The judgment was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that there is no error in any of the rulings of the said hustings court excepted to by the first, second, third and fourth bills of exceptions, made parts of the record of this cause,
But the count is further of opinion, for reasons stated as aforesaid, that there is error in the ruling of the said court excepted to by the fifth of the said bills of exceptions, made part of the said record, and that the said court erred in overruling the motion of the plaintiff in error to set aside the verdict of the jury because the same was contrary to law and the evidence and grant him a new trial; this court, being of opinion that according to the facts certified in the said fifth bill of exceptions to have been proved on the trial of the said cause in the hustings court, the accused, the said plaintiff in error, was not guilty of the offence with which he was charged, and of which he was convicted on the said trial.
Therefore, it is considered, ordered and adjudged that the said judgment of the said hustings court be reversed and annulled, the said verdict be set aside, and the cause remanded to the said hustings court for a new trial to be had therein, in conformity with the foregoing opinion.
Which is ordered to be certified to the said hustings court of the city of Richmond.
Judgment reversed.